AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>TARGET ACCOUNTS 1-5, as further described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 26-MJ-4062 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

TARGET ACCOUNTS 1-5, as further described in Attachment A, which is incorporated herein by reference

located in the _____ Western _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC §§ 287, 371, 641, 666, 1001, 1028A, 1343, and 1349 | False, Fictitious, or Fraudulent Claims, Conspiracy, Theft of Government Funds, Theft or Bribery Concerning Programs Receiving Federal Funds, False Statements, Aggravated Identity Theft, Wire Fraud, and Wire Fraud Conspiracy |

The application is based on these facts:
See the attached Affidavit of Frank McQuillan, Special Agent (SA), Department of Veteran Affairs (VA), Office of Inspector General (OIG), which is incorporated herein by reference

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Frank McQuillan, SA, VA OIG
*Printed name and title*

Submitted electronically in .pdf format. Oath administered and contents and signature attested to me and before me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: May 19, 2026

_____
*Judge's signature*

City and state: Rochester, NY

Hon. Colleen D. Holland, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

STATE OF NEW YORK    )
COUNTY OF MONROE    )        SS:
CITY OF ROCHESTER    )

I, Frank McQuillan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am currently a special agent with the U.S. Department of Veterans Affairs ("VA"), Office of Inspector General ("OIG"), Office of Investigations, located in Minneapolis, Minnesota.  I began my law enforcement career as a special agent with the United States Secret Service ("USSS") in the Minneapolis Field Office, from 2010 to 2015, where I investigated financial crimes involving wire fraud, bank fraud, credit card and check fraud, mortgage fraud, counterfeiting of U.S. currency, international trade-based money laundering, and threats made against individuals protected by the USSS, including the President, Vice President and their family members.  From 2015 to 2020, I worked for the VA OIG as a special agent and investigated crimes related to the programs and operations of the VA.  From 2020 to 2023, I was a special agent with Homeland Security Investigations ("HSI") in the cyber and financial crimes group in St. Paul, Minnesota, where my focus was on both domestic and international money laundering investigations.  In 2023, I came back to VA OIG as a special agent where I am currently employed, investigating crimes related to the programs and operations of the VA.  Based on my own training and experience, and discussions with other VA OIG special agents with whom I work, I am familiar with the rules and regulations governing VA education benefits, the methods used to commit education

benefits-related fraud against the United States, and the documents and other records that frequently evidence such fraud.

2.      I make this affidavit in support of an application for a warrant to search the Google accounts associated with the below email addresses stored at premises controlled by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043:

a.      JAMIE@DSDT.TECH (hereinafter "TARGET ACCOUNT 1");

b.      KATIE@DSDT.TECH (hereinafter "TARGET ACCOUNT 2");

c.      MACKENZIE@DSDT.TECH      (hereinafter      "TARGET ACCOUNT 3");

d.      ASHLEY@DSDT.TECH (hereinafter "TARGET ACCOUNT 4"); and

e.      THANDEKA@DSDT.TECH      (hereinafter      "TARGET ACCOUNT 5" and together with TARGET ACCOUNTS 1 through 4, collectively the "TARGET ACCOUNTS").

3.      The TARGET ACCOUNTS are further described in Attachment A.

4.      As is set forth in greater detail below, I respectfully submit that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Section 287 (False, Fictitious, or Fraudulent Claims), Title 18, United States Code, Section 371 (Conspiracy), Title 18, United States Code, Section 641 (Theft of Government Funds), Title 18, United States Code, Section 666 (Theft or Bribery Concerning Programs Receiving Federal Funds), Title 18, United States Code, Section 1001 (False Statements), Title 18 United States Code, Section 1028A (Aggravated Identity Theft), and Title 18, United States Code, Sections 1343 and 1349 (Wire Fraud and Conspiracy to Commit

Wire Fraud) (hereinafter, collectively the "TARGET OFFENSES") are presently located in the TARGET ACCOUNTS.

5.      This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

6.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  It is based on my personal knowledge, interviews of witnesses, my review of business and VA records, information received from other law enforcement agents, my training and experience, and the experience of other agents.

## PROBABLE CAUSE

### Summary

7.      VA OIG is investigating DSDT, HARRIS, KOTHE, FULTON, TANCREDI, HLATSHWAYO, and others (hereinafter, collectively the "TARGETS") for engaging in a scheme to defraud the VA by submitting fraudulent documents and making false claims for payment of education benefits on behalf of veterans.

8.      In the course of this scheme, the TARGETS made false and fraudulent representations to the VA indicating that veterans had attained meaningful employment

following the completion of their DSDT training programs when, in truth, the veterans had not obtained such employment, employment that was obtained was not related to the program of study, or the employment was obtained prior to completion of the program of study and not because of the training or skills provided by the program of study.

9.     As a result of these fraudulent representations and false claims, between in or around May 2019 and in or around July 2024, the VA paid more than $5.3 million in VET TEC educational benefits to DSDT.

*Background Regarding Veterans Affairs Educational Assistance Under the Department of Veterans Affairs High Technology Program*

10.     Public Law 115-48 (the "Harry W. Colmery Veterans Educational Assistance Act of 2017") established the Department of Veterans Affairs ("VA") Veteran Employment Through Technology Education Courses ("VET TEC") program, a 5-year pilot program that ended in April 2024 and provided educational assistance to veterans of the United States Armed Forces[1] by paying tuition, housing costs, and other educational costs and fees associated with the veterans' enrollment in certain technology-focused educational programs.

11.     The purpose of VET TEC was to help veterans readjust to civilian life by providing them with an opportunity to enroll in high technology educational programs that provided training or skills sought by employers in a relevant field or industry.

---

[1] In addition to veterans, other classes of individuals including reservists were eligible to receive VET TEC benefits. For purposes of clarity, this affidavit uses the term "veteran" to mean any person receiving VET TEC benefits.

4

*Payments to Schools*

12.     VET TEC was a pay-for-performance program, meaning the VA paid schools only after the schools certified that a student reached certain milestones:

a.     When a veteran enrolled in a program, the VA paid the first 25 percent of the veteran's tuition and fees;

b.     When a veteran completed a program, the VA paid the next 25 percent of the veteran's tuition and fees; and

c.     When a veteran attained meaningful employment in the program's field of study within 180 days of completing the program, the VA paid the final 50 percent of the veteran's tuition and fees.

13.     The VA sent tuition and fee payments directly to each school on the enrolled veteran's behalf.  In addition, the VA also provided monthly housing allowance benefits directly to veterans who were enrolled in an approved program more than half-time.

*School Certifying Officials*

14.     Each school that received VA tuition assistance funds was required to designate a School Certifying Official ("SCO").  A school could designate more than one SCO.

15.     The SCO was required to complete and submit the following forms to the VA:

a.     *Enrollment Certification*: VA Form 22-1999, the VA Enrollment Certification (hereinafter the "Enrollment Certification") required SCOs to certify, for

5

each veteran who received VA tuition assistance funds, the course in which the veteran was being enrolled, the start and end dates of the enrollment period, the number of hours per week the veteran was to attend class, and the cost of tuition for the course. The SCO was also required to notify the VA of any changes in the information s/he certified.

b.      *Notice of Change*: VA Form 22-1999b, Notice of Change in Student Status (hereinafter the "Notice of Change") required SCOs to notify the VA when a student graduated from the program.

c.      *Employment Certification*: VA Form 22-10201, Employment Certification Under the VET TEC Program (hereinafter the "Employment Certification") required SCOs to report each veteran's hire date, type of employment (full-time/part-time/temporary, internship, apprenticeship, contract employment, or self-employment), employer name, employer address, job title, salary, supervisor name, supervisor telephone number, supervisor email, and a description of how the job duties and responsibilities aligned with the completed field of study, among other things. The veteran and SCO both had to sign the Employment Certification and certify, "that the information provided...is true, complete and correct to the best of my knowledge and belief, and (2) that...I understand that by submitting this certification, I am making a statement to the government for the purpose of obtaining federal benefits. Section 1001 of Title 18 of the U.S. Code makes it a criminal offense for any person to knowingly and willfully make false

6

or fraudulent statements to any department or agency of the United States Government."

16.    Throughout the VET TEC 5-year pilot program, lasting from approximately 2019 through 2024, the program was administered by the Veterans Benefits Administration ("VBA") Buffalo Regional Office ("RO") in the Western District of New York.    All communications, certifications, claims for payment, and payments were processed through the Buffalo RO, regardless of the physical location of the VET TEC school or veteran enrollee.

## BACKGROUND REGARDING THE TARGETS

17.    According to records maintained by the Michigan Secretary of State, DSDT College, Inc. doing business as DSDT (hereinafter "DSDT") is a company incorporated under the laws of Michigan with its principal place of business at 1759 West 20th Street, Detroit, Michigan.[2]

18.    DSDT's website indicates that the school "offers a comprehensive selection of certificate, diploma and associate degree programs. [DSDT's] programs are designed to meet industry and employer needs for student placement opportunities. [DSDT's] distinguished faculty are leaders in their fields, bringing real-world experience and cutting-edge research into the classroom.    [DSDT] provides the resources and support necessary for students to excel both academically and personally at [its] state of the art facilities and online."[3]

---

[2] DSDT was formerly known as Astute Artistry LLC doing business as DSDT until approximately April 2024.

[3] The DSDT website is https://dsdt.edu/about-us (last visited October 29, 2025).

19.     Jamie HARRIS is the Chief Executive Officer and co-owner of DSDT. HARRIS has been the primary SCO for DSDT since it was first approved to train veterans and eligible persons.

20.     As SCO, HARRIS regularly submitted Enrollment Certifications, Notices of Change, and Employment Certifications to the VA.

21.     HARRIS used TARGET ACCOUNT 1 and JAMIE@DSDT.EDU as her email accounts.

22.     Kathryn KOTHE is DSDT's Director of Financial Aid and Director of Administration.

23.     KOTHE is believed to be HARRIS's daughter.

24.     KOTHE was a secondary SCO for DSDT.

25.     KOTHE used TARGET ACCOUNT 2 and KATIE@DSDT.EDU as her email accounts.

26.     Mackenzie FULTON is DSDT's Compliance Officer, COR Liaison, and Human Resources Manager.

27.     FULTON is believed to be Jamie HARRIS's daughter.

28.     FULTON was a secondary SCO for DSDT and regularly submitted Enrollment Certifications and Notices of Change to the VA.

8

29.     FULTON used TARGET ACCOUNT 3 and MACKENZIE@DSDT.EDU as her email addresses.

30.     Ashley TANCREDI is a former Director of Job Placement for DSDT.

31.     TANCREDI used TARGET ACCOUNT 4 as her email address.

32.     Thandeka HLATSHWAYO is a former Lead Career Specialist for DSDT.

33.     HLATSHWAYO used TARGET ACCOUNT 5 as her email address.

### DSDT'S VET TEC APPROVAL AND PROGRAMS OF STUDY

34.     Effective on or about May 1, 2019, the VA approved DSDT's non-college degree programs in Technology Professional 2 and Technology Professional 6 for the VET TEC program.

35.     The Technology Professional 2 program is described on DSDT's website as a program where "students will have the opportunity to prepare for the CompTIA A+ certification, which is a widely recognized and highly respected credential in the field of IT. The CompTIA A+ certification is designed to certify the skills of IT professionals in the installation, configuration, and troubleshooting of computer hardware and software.  To obtain the certification, participants will need to pass two exams: 220-1001 and 220-1002. In this course, you will receive the necessary training and support to help prepare for these exams. Students will have access to online study materials, practice tests, and instructor-led lectures to help gain a thorough understanding of the concepts covered on the exams."

(Source: https://dsdt.edu/programs/technology-professional-2-program/, last visited December 15, 2025.)

36.    The Technology Professional 2 program was an 80 Clock Hour program with a $5,000.00 tuition fee.[4]

37.    The Technology Professional 6 program is described on DSDT's website as a program "designed to provide students with a comprehensive understanding of the technologies and practices used in the IT industry. The program is focused on preparing students for a variety of CompTIA certification exams, including Network+, Security+, and CySA+.  Throughout the program, students will have the opportunity to learn from experienced professionals and gain hands-on experience in a range of IT subjects. They will learn about networking, cybersecurity, and cybersecurity analysis, and will develop the skills and knowledge necessary to succeed in these areas.  The program consists of several courses, including Network+, Security+, and CySA+. Upon completion of the program, students will receive a certificate of completion and will be well-prepared to take the corresponding certification exams.  (Source: https://dsdt.edu/programs/technology-professional-6-program/, last visited December 15, 2025.)

38.    The Technology Professional 6 program was a 240 Clock Hour program with a $15,000.00 tuition fee.[5]

---

[4] The Technology Professional 2 program was withdrawn from the VET TEC program on October 1, 2020.

[5] A Technology Professional 6 – 3D Printing and Design Program was also approved by the VA for the VET TEC Program on January 1, 2020, a 240 Clock Hour program with a $15,000.00 tuition fee.

10

39.     On or about February 1, 2023, the VA also approved DSDT's non-college degree program Full Stack Developer for the VET TEC program.

40.     The Full Stack Developer curriculum is described on DSDT's website as a program "designed to provide students with the knowledge and skills necessary to develop native applications. Throughout the program, students will learn how to use a range of programming languages and frameworks, including Python, Java Script and React to create high-quality apps that are optimized for operating systems.  The program is suitable for students who are interested in pursuing a career in software development or who want to learn how to build their applications for personal or professional use. It is a hands-on program that focuses on practical skills and real-world applications, giving students the opportunity to gain experience in the development process from start to finish."    (Source: https://dsdt.edu/programs/full-stack-developer-program/, last visited December 15, 2025.)

41.     The Full Stack Developer program was a 320 Clock Hour program with a $16,500.00 tuition fee.

## DSDT'S SUBMISSION OF FRAUDULENT EMPLOYMENT CERTIFICATIONS AND OFFER LETTERS

42.     Between approximately in or around May 2019 and in or around July 2024, approximately 561 veterans enrolled at DSDT through the VET TEC program.  Of the 561 veterans who enrolled, DSDT reported that approximately 436 graduated from the programs and only 242 attained full-time meaningful employment in the program's field of study within 180 days.

11

43.     DSDT submitted Employment Certifications and (sometimes) job offer letters for the 242 veterans who DSDT claimed obtained full-time meaningful employment within 180 days. These submissions also served as DSDT's claim for payment from the VA of the final 50 percent of each veteran's tuition and fees.

44.     According to the VA's records, HARRIS's signature (in many cases a digital signature) appeared on all of the approximately 242 Employment Certifications.

45.     HARRIS submitted approximately 216 of those Employment Certifications to the VA using TARGET ACCOUNT 1.[6]

*Veteran B.R.*

46.     On or about March 31, 2024, a veteran and VET TEC participant (hereinafter "B.R.") submitted a complaint regarding DSDT.

47.     In his/her complaint, B.R. stated that s/he had received a letter from the VA's Buffalo Regional Office stating that the VA had paid DSDT the final 50 percent of the cost of B.R.'s tuition because B.R. had secured meaningful employment within 180 days of completing his/her DSDT program.

48.     B.R. claimed s/he did not secure meaningful employment within 180 days of completing his DSDT program. Instead, B.R. alleged that a DSDT representative contacted him/her to ask if s/he had received a job in tech. B.R. told the DSDT representative that

---

[6] Seven of the remaining Employment Certifications were sent to the VA the by a former DSDT Director of Workforce Development. The VA did not preserve copies of the emails through which the nineteen of the remaining Employment Certifications were submitted.

12

s/he had found a job, but that it was not related to the technical industry or DSDT's program. The DSDT representative then asked B.R. to send confirmation of the job in writing, and B.R. sent confirmation to the DSDT representative.

49.     On or about October 7, 2025, VA OIG agents interviewed B.R. During this interview, B.R. provided the following additional information regarding DSDT.

50.     B.R. graduated from DSDT's Full Stack Developer certificate program through the VET TEC program in or around February 2024.

51.     According to B.R., the DSDT Full Stack Developer Program consisted of classes occurring two to three days a week *via* a Microsoft Teams video call. The classes were supposed to run eight hours a day, from approximately 8:30am to 3:00 or 4:00 pm. But classes were always done around noon or 1:00pm.

52.     On the first day of the second week, the class may have lasted for eight hours. After that, classes became only "check-ins." Most of the instructors just stopped teaching. During three out of the four classes, all but the last class, there were basically zero teaching hours. There were no grades and no assignments for all four classes.

53.     After B.R. completed the program, DSDT asked him/her for an offer letter to establish his/her employment. B.R. told DSDT that s/he attained a job, but the job had nothing to do with technology or anything related to the DSDT training. Nonetheless, DSDT asked B.R. to send a copy of the offer letter, and s/he did.

54.     The job that B.R. actually attained was as a transporter at a medical facility where B.R. pushed beds for around $15.00 an hour during the night shift. B.R. would sit at

13

the front of the emergency room entrance and help people find their way to and from the emergency room. B.R. would also push people's wheelchairs or walk them up to their rooms from the emergency room. B.R. said this is all the job entailed.

55.    B.R. provided VA OIG agents with a copy of an email, dated March 19, 2024, that s/he sent to HLATSHWAYO at TARGET ACCOUNT 5. In the email, which is pictured below, B.R. told HLATSHWAYO that the job was "a non tech role. The position is 'way finder' (transporter)." B.R. further explained that s/he would be "helping people get to registration for the ER from the main entrance...There is no tech involved in this job."



56.    B.R. also provided VA OIG agents with a copy of the true job offer letter (hereinafter "B.R.'s True Offer Letter") that B.R. attached to his March 19, 2024 email to DSDT. The true offer letter is pictured below:

14



57.    VA OIG agents then showed B.R. a copy of the offer letter that DSDT sent to the VA (hereinafter "B.R.'s Fake Offer Letter"), which is included below:



*Our Mission*
To serve through healing, education and discovery

March 5, 2024

We are pleased to confirm the verbal preliminary offer of employment extended to you for the position of Infrastructure Architect 1 beginning March 25, 2024, working under the supervision of ████████████ Your position here will be non-exempt with a beginning salary rate of $20.00 per hour.

The verbal offer is contingent upon the successful completion of the following:
- Health assessment including a drug screen, administration of the Quantiferon Gold (IGRA) test or TB documentation within the last 3-12 months, and immunization check.
- Bring a complete immunization list with dates to this appointment including your most recent TB skin test and flu shot. This appointment must be completed at least 7 calendar days before your start date. If this has not been scheduled by the time you receive this letter, call Human Resources immediately at ████████
- Criminal background check and education verification.
- I-9 eligibility forms and documentation, and compliance with the 2011 Tennessee Lawful Employment Act.
- Other assessments and verifications as may be required.
- If applicable, successful completion of the ████████████ credentialing process

We hope you will find this to be the beginning of a rewarding work experience. If Human Resources may be of assistance, please contact us.

Sincerely,

*We Value*
Integrity • Excellence • Compassion • Innovation • Collaboration • Dedication

58.   B.R. told VA OIG agents that this was not a genuine copy of his/her offer letter. B.R. was never offered a role as "Infrastructure Architect 1" and B.R.'s beginning salary was not $20/hour.

59.   B.R. said he never possessed and did not help create the Fake Offer Letter. B.R. believed the Fake Offer Letter came from DSDT. B.R. said s/he was 100% sure s/he never sent the Fake Offer Letter to DSDT.

16

60.    B.R. also confirmed that s/he never received a job offer for any technical role since s/he completed DSDT's program.

61.    VA OIG agents also showed B.R. the Employment Certification that DSDT emailed to the VA on his behalf (hereinafter "B.R.'s Forged Employment Certification"). The Employment Certification appeared to have been signed by B.R.  However, B.R. reviewed the Employment Certification and indicated (a) it contained false statements regarding B.R.'s employment and (b) B.R.'s signature had been forged.

62.    According to the VA's records, on or about March 19, 2024, at 2:12pm, HARRIS used TARGET ACCOUNT 1 to submit B.R.'s Forged Employment Certification and Fake Offer Letter to the VA.

63.    The email chain, pictured below, shows that the attachments were originally sent from TANCREDI using TARGET ACCOUNT 4 to HARRIS using TARGET ACCOUNT 1, HLATSHWAYO using TARGET ACCOUNT 5, and FULTON using TARGET ACCOUNT 3.

**From:** Jamie Harris <jamie@dsdt.tech>
**Sent:** Tuesday, March 19, 2024 2:12 PM
**To:** VBABUF, VETTEC <VETTEC.VBABUF@va.gov>
**Cc:** Mackenzie Fulton <mackenzie@dsdt.tech>; Ashley Tancredi <ashley@dsdt.tech>
**Subject:** [EXTERNAL] ███████ _school code 2V00012

Hello,

Please confirm receipt of this email for processing and submission/ payment.

Best regards,
**Jamie Harris**
CEO, DSDT

**DSDT**

1759 W. 20th Street Detroit, MI 48216

4301 E Stan Schlueter Loop Building #1 Killeen, TX 76542

E jamie@dsdt.tech **ALT E** jamie@dsdt.edu
**M** 248-756-0806 **W** 313-263-4200
Click here for all Military Service Members and Veterans Inquiries
Click here for all General Student Inquiries
Click here to fill out our Employer Questionnaire
Click here to download our Student Brochure

1

DSDT - SEE WHO WE ARE

A Message From Our Owner

Preview YouTube video Outstanding Tech and Innovative Small Business: DSDT

Outstanding Tech and Innovative Small Business: DSDT

---------- Forwarded message ----------
**From:** Ashley Tancredi <ashley@dsdt.tech>
**Date:** Tue, Mar 19, 2024 at 2:05 PM
**Subject:** ███████
**To:** Jamie Harris <jamie@dsdt.tech>, Thandeka Hlatshwayo <thandeka@dsdt.tech>, Mackenzie Fulton <mackenzie@dsdt.tech>

Please see attachments

**Ashley Tancredi**
*Director of Job Placement*
*DSDT*
*1759 W 20th Street, Detroit MI 48216*
*4301 E. Stan Schlueter Loop Bldg. #1 Killeen, TX 76542*
*C: (313) 509-7151. Website: dsdt.edu*
*Connect with me Ashley Tancredi | LinkedIn*

64.     As a result of HARRIS's submission of B.R.'s Forged Employment Certification and Fake Offer Letter to the VA, on or about March 20, 2024, the VA paid DSDT $8,250, which represented the final 50 percent of the DSDT tuition for B.R.

65.     B.R. said HARRIS contacted B.R. sometime after B.R. submitted a complaint to the VA.  HARRIS offered to remedy the situation by giving B.R. another class and an extra month of training.  HARRIS also offered B.R. a position as a consultant to fix DSDT's education program. B.R. declined the job offer.

66.     On or about April 12, 2024, DSDT attempted to supplement or correct B.R.'s Forged Employment Certification for B.R.  Specifically, DSDT Director of Financial Aid and Director of Administration Kathryn KOTHE submitted an inquiry on Ask VA portal, accessible at https://www.VA.gov/contact-us/ask-VA/introduction.  The inquiry began, "DSDT debt owed to the VA on behalf of [B.R.]" and stated, "We are currently in the middle of our student file audit and are reviewing files.  While doing so, we came across a student who was paid for placement[.]  [H]owever[,] we later realized that that placement was not in the field of study.  We submitted a placement for information technology[,] but [B.R.] was enrolled in our Full Stack [D]evelopment course.  We are currently requesting a debt to our school, DSDT (school code: 2V00012) of $8,250.00, so we are able to pay this back to the Veterans Affairs agency.  We called the VA [H]otline and they told us to submit a request to askVA.gov.  You may reach me, Kathryn KOTHE, the certifying official at 248-928-4844 or KATIE@DSDT.TECH [TARGET ACCOUNT 2].  Thank you."

19

67. On or about May 9, 2024, KOTHE using TARGET ACCOUNT 2 sent a second inquiry to VETTEC.VBABUF@the VA.gov with the subject line, "[B.R.] debt letter needed to pay back funds."

68. As a result, on or about May 20, 2024, the VA sent the requested debt letter to DSDT for $8,250.00, and on or about June 12, 2024, DSDT paid the debt of $8,250.00 to the VA.

*Veteran N.D.*

69. On or about May 16, 2024, another veteran (hereinafter "N.D.") submitted a complaint to the VA regarding DSDT.

70. In the complaint, N.D. claimed that a DSDT professor split time between two classes. While the professor taught a Security+ course, the students in the CySa+ course would have to wait two hours, some students just sitting in class waiting. According to N.D.'s complaint, most of the time this professor read from slides for 20 minutes then had students watch YouTube videos.

71. In the complaint, N.D. also stated s/he had been receiving phone calls and messages from DSDT representatives almost daily about filling out a job form. N.D. stated that s/he was harassed by school representatives who called his/her spouse and offered Amazon gift cards as a bribe to fill out the job form.

72. On or about February 6, 2026, VA OIG agents interviewed N.D. N.D. told the agents that s/he was enrolled in the Technology Professional 6 program at DSDT using the VET TEC program. N.D. told agents that DSDT was "a scam" and failed to provide the

20

instruction and job preparation it advertised. N.D. attended several DSDT courses intended to prepare students for CompTIA examinations including Network+, Security+, and CySa+. N.D. was told these classes would help prepare him/her to obtain CompTIA certifications, and that DSDT would help him/her get a job within six months of graduation. However, according to N.D., the training that N.D. received in DSDT's classes would not help you pass the CompTIA examinations.

73.    N.D.'s second instructor in the Technology 6 program frequently made students in N.D.'s class wait two hours while the instructor was teaching another class simultaneously. According to N.D., the instructor was assigned to two courses at the same time. Students in N.D.'s course routinely waited approximately two hours during class hours with no instruction. The instructor taught Security+ while the CySa+ class sat idle and taught CySa+ while the Security+ class sat idle. The instructor relied primarily on YouTube videos and provided no original instruction. N.D. told agents that classes were not held for the full required instructional period.

74.    N.D. identified Ashley TANCREDI as DSDT's Job Placement Director. N.D. said TANCREDI sent N.D. job leads using a job website, but the positions were not technology related and were not within 100 miles of N.D.'s residence. N.D. emailed TANCREDI to inform her the job leads within 100 miles of N.D. were not technology related.

75.    N.D. said DSDT representatives, including TANCREDI and HLATSHWAYO, called or messaged N.D. daily, sometimes multiple times per day. N.D.

stated s/he blocked several DSDT email addresses due to the volume of contact and described these DSDT communications as "harassment."

76.    According to N.D., the repeated contact intensified in Spring 2024 (April–May) when DSDT sent N.D. a VET TEC employment verification form through a SignNow.com link. N.D. told DSDT representatives repeatedly s/he was not yet officially employed. N.D. stated DSDT called N.D.'s spouse as well, attempting to pressure N.D. to complete employment forms. N.D. required behavioral therapy because of the stress caused by the harassment.

77.    N.D. told agents that N.D. didn't receive employment assistance from DSDT. N.D. eventually obtained a job independently through Rocket.com approximately one year after graduating from DSDT. N.D. also applied for a position with the Passport Office in Detroit but withdrew after delays in the background investigation. N.D. stated DSDT attempted to use the pending Passport Office job opportunity to pressure N.D. into submitting VET TEC forms even though N.D. had not yet been hired. N.D. said she never provided DSDT with an offer letter.

78.    VA records show that DSDT did not submit an Employment Certification for N.D. and was never paid the final 50 percent of the VA tuition and fees payment for N.D.'s Technology 6 program.

*Veteran K.C.*

79.    VA records indicate that, on or about May 26, 2023, a veteran ("hereinafter "K.C.") completed the DSDT Technology Professional 6 program.

22

80.     On or about August 16, 2023, HARRIS emailed an Employment Certification and Amazon job offer letter for K.C. to the VA using TARGET ACCOUNT 1.  These documents certify and claim that K.C. attained an **IT Support Technician** position at Amazon located in Little Rock, Arkansas with a hire date of May 26, 2023, a start date of June 12, 2023, and a starting pay of $22.00 per hour.

81.     Records obtained from Amazon show that K.C. was originally offered a position by Amazon on or about January 18, 2023, as a Warehouse Associate with a start date of January 31, 2023, and a starting pay of $16.00 per hour.  Records obtained from Amazon further show that on or about May 26, 2023, K.C. was offered a position as a **Fulfillment Associate**, with a start date of May 28, 2023, and a starting pay of $16.50 per hour.

82.     An open source internet search for the job description of an Amazon Fulfillment Center Warehouse Associate lists **duties that are not related to information technology or the DSDT Technology Professional 6 program** that K.C. completed including: receiving and putting away inventory, getting customer orders ready and packing them up, loading boxes into trucks for shipment, using scanners to read bar codes on products, viewing prompts on screens and following the direction for some tasks, troubleshooting problems, ensuring product meets quality requirements, operating powered industrial trucks (PIT) such as a forklift or pallet driver, and working at heights up to 40 feet.

83.     As a result of HARRIS's submission of an Employment Certification and offer letter related to K.C., on or about August 22, 2023, the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for K.C.

23

*Veteran T.P.*

84.     VA records indicate that T.P. completed the DSDT Technology Professional 6 program on or about November 11, 2022.

85.     VA records show that on or about May 4, 2023, HARRIS emailed an Employment Certification and Amazon job offer letter for T.P. to the VA using TARGET ACCOUNT 1. TARGET ACCOUNT 4 was cc'd on this email.

86.     These documents certified that T.P. obtained a remote **Customer Service Associate/Service Desk** position at Amazon with a hire date of **November 17, 2022**, a start date of December 5, 2022, and a starting pay of $19.00 per hour.

87.     Records obtained from Amazon show that Amazon actually offered T.P. a position as a **Warehouse Associate** on or about **February 1, 2022**, with a start date of February 3, 2022, and a starting pay of $15.50 per hour with a $0.60 per hour shift differential. **This was months before T.P. completed DSDT's Technology Professional 6 program.**

88.     On or about May 18, 2023, as a result of HARRIS's submission of an Employment Certification and offer letter for T.P., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for T.P.

*Veteran T.B.*

89.     VA records indicate that T.B. completed the DSDT Technology Professional 6 program on or about March 31, 2023.

90.     VA records show that on or about May 24, 2023, HARRIS emailed an Employment Certification and HTC Global job offer letter for T.B. to the VA using TARGET ACCOUNT 1. TARGET ACCOUNT 4 was cc'd on HARRIS's email.

91.     These documents certify and claim that T.B. obtained an IT Service Desk Analyst-Remote position at HTC Global Services located in Troy, Michigan, with a hire date of May 23, 2023, a start date of June 5, 2023, and a starting pay of $17.00 per hour.

92.     Records obtained from HTC Global Services show that **T.B. has never been employed by HTC Global Services in any capacity**.

93.     On or about June 5, 2023, as a result of HARRIS's submission of Employment Certification and offer letter for T.B., the VA paid DSDT $7,500.00, the final 50% of the DSDT tuition for T.B.

*Veteran D.R.*

94.     VA records indicate that D.R. completed the DSDT Technology Professional 6 program on or about January 6, 2023.

95.     VA records show that on or about January 19, 2023, HARRIS emailed an Employment Certification and HTC Global job offer letter for D.R. to the VA using TARGET ACCOUNT 1. TARGET ACCOUNT 4 was cc'd on HARRIS's email to the VA.

96.     These documents certify and claim that D.R. obtained a Help Desk/Technical Support (Clinical Resolution Analyst) position at HTC Global Services located in Troy,

Michigan, with a hire date of January 16, 2023, a start date of February 13, 2023, and a starting pay of $18.00 per hour.

97.    Records obtained from HTC Global Services show that **D.R. has never been employed by HTC Global Services in any capacity.**

98.    On or about February 13, 2023, as a result of HARRIS's submission of the Employment Certification and offer letter for D.R., the VA paid DSDT $11,250.00, which includes the final 50 percent of the DSDT tuition for D.R. and an additional 25 percent of DSDT tuition not previously paid to DSDT.

*Veteran M.C.*

99.    VA records indicate that M.C. completed the DSDT Technology Professional 6 program on or about June 24, 2022.

100.    VA records show that on or about August 10, 2022, HARRIS emailed an Employment Certification and HTC Global job offer letter for M.C. to the VA using TARGET ACCOUNT 1. These documents certify and claim that M.C. obtained a Help Desk/Technical Support (Clinical Resolution Analyst) position at HTC Global Services located in Troy, Michigan, with a hire date of August 3, 2022, a start date of August 22, 2022, and a starting pay of $15.00 per hour.

101.    Records obtained from HTC Global Services show that **M.C. has never been employed by HTC Global Services in any capacity.**

102.   On or about September 12, 2022, as a result of HARRIS's submission of the Employment Certification and offer letter for M.C., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for M.C.

*Veteran R.G.*

103.   VA records indicate that R.G. completed the DSDT Technology Professional 6 program on or about July 21, 2023.

104.   VA records show that on or about November 13, 2023, HARRIS emailed an Employment Certification and Allied Universal job offer letter for R.G. to the VA using TARGET ACCOUNT 1.  TARGET ACCOUNT 3 and TARGET ACCOUNT 4 were cc'd on HARRIS's email to the VA.

105.   These documents certify and claim that R.G. obtained an **IT Infrastructure Engineer** position at Allied Universal with **a hire date of August 1, 2023**, a start date of August 21, 2023, and a starting pay of $23.00 per hour.

106.   Records obtained from Allied Universal show that R.G. was actually hired by Allied Universal on **January 5, 2022**, as a **Security Professional - Unarmed** at a location in Georgia with a starting pay of $15.00 per hour.  That was **before R.G. enrolled in DSDT's Technology Professional 6 program**.

107.   An open source internet search for the job description of an Allied Universal Security Professional - Unarmed list duties that are **not related to information technology or the DSDT Technology Professional 6 program** that R.G. completed including: conducting regular rounds and remaining highly visible to help deter security-related incidents, providing

27

customer service to clients by carrying out security-related procedures, site-specific policies and when appropriate, emergency response activities, responding to incidents and critical situations in a calm, problem-solving manner, and conducting regular and random patrols around the business and perimeter.

108.    On or about December 14, 2023, as a result HARRIS's submission of the Employment Certification and offer letter for R.G., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for R.G.

*Veteran R.M.*

109.    VA records indicate that R.M. completed the DSDT Technology Professional 6 program on or about November 11, 2022.

110.    VA records show that on or about April 25, 2023, HARRIS emailed an Employment Certification and Allied Universal job offer letter for R.M. to the VA using TARGET ACCOUNT 1. TARGET ACCOUNT 4 was cc'd on HARRIS's email to the VA.

111.    These documents certify and claim that R.M. attained a **Security Systems Administrator** position at Allied Universal with a hire date of **November 21, 2022**, a start date of November 28, 2022, and a starting pay of $22.00 per hour.

112.    Records obtained from Allied Universal show that R.M. was actually hired by Allied Universal on or about **September 26, 2022**, as a **Security Professional - Armed** with a starting pay of $25.00 per hour.

28

113. An open source internet search for the job description of an Allied Universal Security Professional - Armed list duties that are **not related to information technology or the DSDT Technology Professional 6 program** that R.M. completed including: conducting regular rounds and remaining highly visible to help deter security-related incidents, providing customer service to clients by carrying out security-related procedures, site-specific policies and when appropriate, emergency response activities, responding to incidents and critical situations in a calm, problem-solving manner, and conducting regular and random patrols around the business and perimeter.

114. On or about May 17, 2023, as a result of HARRIS's submission of an Employment Certification and offer letter for R.M., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for R.M.

*Veteran I.K.*

115. VA records indicate that I.K. began DSDT's Technology Professional 6 program on or about March 6, 2023, and completed the program on or about May 26, 2023.

116. VA records show that on or about August 18, 2023, HARRIS emailed an Employment Certification and Spectrum job offer letter I.K. to the VA using TARGET ACCOUNT 1. TARGET ACCOUNT 3 and TARGET ACCOUNT 4 were cc'd on HARRIS's email to the VA.

117. These documents certify and claim that I.K. obtained a Field Service Technician position at Spectrum with a hire date of June 5, 2023, a start date of June 26, 2023, and a starting salary of $65,000.

29

118.    Records obtained from Spectrum show that I.K. was actually originally offered a position by Spectrum on or about September 13, 2022, as a Field Technician II with a start date of October 3, 2022, and a starting pay of $20.50 per hour.  Spectrum records show that **I.K. voluntarily separated from his/her employment with Spectrum on or around March 2, 2023, before I.K. even started DSDT's Technology Professional 6 program.**

119.    On or about August 24, 2023, as a result of HARRIS's submission of an Employment Certification and offer letter for I.K., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for I.K.

*Veteran E.P.*

120.    VA records indicate that E.P. began the DSDT Technology Professional 6 program on or about February 6, 2023, and completed the program on or about April 28, 2023.

121.    VA records show that on or about July 21, 2023, HARRIS emailed an Employment Certification and Concentrix job offer letter for E.P. to the VA using TARGET ACCOUNT 1.  TARGET ACCOUNT 3 and TARGET ACCOUNT 4 were cc'd on HARRIS's email to the VA.

122.    These documents certify and claim that E.P. attained a Technician Support Advisor - Remote position at Concentrix with a hire date of May 15, 2023, a start date of June 5, 2023, and a starting salary of $18.00 per hour.

123.    Records obtained from Concentrix show that E.P. was actually originally offered a seasonal, non-permanent, position by Concentrix on or about April 4, 2023, as an

30

Advisor II, Customer Service for the Intuit program in a work at home position with a start date of April 10, 2023, and a starting pay of $15.00 per hour. Concentrix records show that **E.P. ended his employment with Concentrix on or about April 19, 2023, before E.P. completed the DSDT Technology Professional 6 program.**

124. On or about July 28, 2023, as a result of HARRIS's submission of an Employment Certification and offer letter for E.P., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for E.P.

*Veteran J.R.*

125. VA records indicate that J.R. began the DSDT Technology Professional 6 program on or about October 16, 2023, and completed the program on or about January 5, 2024.

126. VA records show that on or about January 23, 2024, HARRIS emailed an Employment Certification and UPS job offer letter for J.R. to the VA using TARGET ACCOUNT 1. TARGET ACCOUNT 3 and TARGET ACCOUNT 4 were cc'd on HARRIS's email to the VA. These documents certify and claim that J.R. attained an Industrial Engineering Supervisor - Transportation ROI position at UPS with a hire date of December 18, 2023, a start date of January 8, 2024, and a starting salary of $40.00 per hour.

127. Records obtained from UPS show that J.R. actually originally accepted a job offer from UPS on or about February 24, 2023, as an Associate IE Supervisor with a start date of February 27, 2023. **UPS records show that J.R.'s employment with UPS ended on or about or about December 31, 2023, before J.R. graduated from the DSDT program.**

31

128.    On or about January 30, 2024, as a result of HARRIS's submission of an Employment Certification and offer letter submitted for J.R., the VA paid DSDT $7,500.00, the final 50 percent of the DSDT tuition for J.R.

## PRESERVATION REQUEST

129.    On or about November 26, 2025, and on or about March 4, 2026, law enforcement served preservation requests on Google, requesting preservation of the TARGET ACCOUNTS.

## BACKGROUND CONCERNING E-MAIL AND INTERNET PROTOCOLS

130.    In general, an email that is sent to a Google subscriber is stored in the subscriber's "mailbox" on Google servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

131.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts like the TARGET ACCOUNTS listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information,

32

and account application information. In my training and experience, such information may constitute evidence of the TARGET OFFENSES because the information can be used to identify the account's user or users.

132.    A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

133.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

134.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service,

33

records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.

135. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

136. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers

34

typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## HISTORICAL GOOGLE ACCOUNT RECORDS

137.    Based on my prior training and experience, and after reviewing Google's privacy policy (https://policies.google.com/privacy), I am aware Google subscribers, which this affidavit seeks a search warrant for, commonly have an associated account with Google, LLC.

138.    When a Google subscriber activates the account, one of the initial prompts during the set-up phase is to associate a Google Gmail e-mail account with the account. The purpose of this account is to facilitate a password reset in the event the consumer forgets their passcode, pattern unlock, or password. If the consumer does not have an existing Gmail account, the operating system prompts the user to create a new account. Whether the Gmail

35

account is new or existing, the association of the account allows Google to collect and store

information relevant to this criminal investigation. This information includes, by way of

example and not limitation:

A. *Account Information* - User name, primary e-mail address, secondary e-mail addresses, connected applications and sites, and account activity, including account sign in locations, browser information, platform information, and internet protocol (IP) addresses. Google maintains information about their customers including primary e-mail addresses, secondary e-mail addresses for account password recovery, applications, websites, and services that are allowed to access the user's Google account or use the user's Google account as a password login, and account login activity such as the geographic area the user logged into the account, what type of internet browser and device they were using, and the internet protocol (IP) address they logged in from. The IP address is roughly analogous to a telephone number assigned to a computer by an internet service provider. The IP can be resolved back to a physical address such as a residence or business with Wi-Fi access or residential cable internet. I believe this information will contain evidence of the TARGET OFFENSES by identifying previously unknown e-mail accounts that have been used in the commission of the TARGET OFFENSES, identifying the individual or individuals who own or operate the TARGET ACCOUNTS, and identifying any unknown co-conspirators.

B. *Android Information* - Device make, model, and International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of all devices linked to the TARGET ACCOUNTS. An International Mobile Equipment Identity (IMEI) is a 15 or 16-digit serial number encoded into the majority of phones in the world. The IMEI is used by cellular service providers to identify authorized devices on their network and to detect stolen phones using or attempting to connect to the network. The IMEI is roughly analogous to the vehicle identification number (VIN) on a motor vehicle and cannot be changed without specialized knowledge and tools. Even if an IMEI number is altered or cloned to another active device, the fraud detection systems of the cellular service providers detect the simultaneous registration and disconnect the devices from the network. Google stores information about mobile devices associated with the user's Google account. This includes the make, model, and unique serial numbers of all linked devices. I believe this information will identify any previously unknown cell phones or other mobile devices associated with the TARGET ACCOUNTS account and/or known device(s).

C. *Evidence of User attribution* – accounts, e-mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information, or any other data that may demonstrate attribution to a particular user or users of the account(s). I know that

36

Google may not verify the true identity of an account creator, account user or any other person who accesses a user's account using login credentials. For these reasons, it is necessary to examine particularly unique identifying information that can be used to attribute the account data to a certain user. This is often accomplished by analyzing associated account data, usage, and activity through communication, connected devices, locations, associates, and other accounts. For these reasons it may be necessary to search and analyze data from when the Google account was initially created to the most current activity.

D. *Calendar* - All calendars, including shared calendars and the identities of those with whom they are shared, calendar entries, notes, alerts, invites, and invitees. Google offers a calendar feature that allows users to schedule events. This calendar function is the default option in the Android operating system and remains so unless the user adds a third-party application. Calendar events may include dates, times, notes and descriptions, others invited to the event, and invitations to events from others. I believe this information will identify dates and appointments relevant to this investigation, as well as, identify previously unknown co-conspirators and/or witnesses, and any potential corroborative evidence.

E. *Contacts* - All contacts stored by Google including name, all contact phone numbers, e-mails, social network links, and images. When a user links the Android device to their Google account the names, addresses, phone numbers, e-mail addresses, notes, and pictures associated with the account are transferred to the phone and vice versa. This process is continuously updated so when a contact is added, deleted, or modified using either the Google account or the mobile device the other is simultaneously updated. I believe this information is pertinent to the investigation, as it will assist with identifying previously unknown coconspirators and/or witnesses.

F. *Documents* - All Google documents including by way of example and not limitation, Docs (a web-based word processing application), Sheets (a web-based spreadsheet program), and Slides (a web-based presentation program.) Documents will include all files whether created, shared, or downloaded. Google offers their users access to free, web-based alternatives to existing word processing, spreadsheet, and presentation software. These documents are stored in the user's account and are accessible from any device or platform as long as the user knows the password. These documents can include those created by the user, modified or edited by the user, or shared by the user and others.

G. *Google Pay (formally Google Wallet and Android Pay)* - All information contained in the associated Google Pay account including transactions, purchases, money transfers, payment methods, including the full credit card number and/or bank account numbers used for the transactions, and address book. Google maintains a unified payment service, which combined Google Wallet and Android Pay into one service. Google Pay is an application that stores purchase and payment activity, along with individual credit card, debit card, and gift card information associated with the Google subscriber(s). Google Pay allows subscribers to send and receive money from a mobile device or computer at no cost to either the sender or receiver and facilitates e-

37

purchases. I believe this the data contains information relevant to the TARGET OFFENSES including records of purchases and payments, as well as money transfers and communications with unknown co-conspirators and/or witnesses, and other information concerning the TARGET OFFENSES.

H. *Gmail* - All e-mail messages, including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and e-mails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (carbon copy) or the 'bcc' (blind carbon copy), the message content or body, and all attached files. As noted previously, when user of an Android device first activates the device they are prompted to associate the device with a Google mail, commonly referred to as Gmail account. The purpose of this account is to facilitate password recovery in the event the user forgets their password or pattern lock. If the user does not have an existing Gmail account, they are prompted to create one. The Gmail account may be used to send and receive electronic mail messages and chat histories. These messages include incoming mail, sent mail, and draft messages. Messages deleted from Gmail are not actually deleted. They are moved to a folder labelled Trash and are stored there until the user empties the Trash file. Additionally, users can send and receive files as attachments. These files may include documents, videos, and other media files. I believe these messages would reveal motivations, plans and intentions, associates, and other co-conspirators related to the TARGET OFFENSES.

I. *Google Photos* - All images, graphic files, video files, and other media files stored in the Google Photos service. Google users have the option to store, upload, and share digital images, graphic files, video files, and other media files. These images may be downloaded from the internet, sent from other users, or uploaded from the user's mobile device. In many cases, an Android user may configure their device to automatically upload pictures taken with a mobile device to their Google account. I believe a review of these images would provide evidence depicting the true identity of the individual or individuals who own and/or operate the TARGET ACCOUNTS and other co-conspirators, known and unknown, who are involved in the in the commission of the TARGET OFFENSES, and victims. I also believe these image files may assist investigators with determining geographic locations such as residences, businesses, and other places relevant to the TARGET OFFENSES.

J. *Location History* - All location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, Wi-Fi locations, and Bluetooth beacons. Such data shall include the date and timestamps of the activity (with identified time zone), the latitude and longitude GPS coordinates, the accuracy display radius (in meters), the source of the activity (e.g. Wi-Fi, cell, Bluetooth or GPS, etc....), the specific Device Tag number, the device Platform information, of all location recordings. Google collects and retains location data from Android enabled mobile devices. The company uses this information for location-based advertising and location-based search results. Per Google, this information is derived from Global

38

Position System (GPS) data, cell site/cell tower information, Wi-Fi access points and Bluetooth beacons. While the specific parameters of when this data is collected are not entirely clear, it appears that Google collects this data whenever one of their services is activated and/or whenever there is an event on the mobile device such as a phone call, text messages, internet access, or e-mail access. I believe this data will show the movements of the individual or individuals who own and/or operate the TARGET ACCOUNTS and other co-conspirators, known and unknown, who are involved in the in the commission of the TARGET OFFENSES and assist investigators with establishing patterns of movement, identifying residences, work locations, and other areas that may contain further evidence relevant to the TARGET OFFENSES.

K. *Play Store* - All applications downloaded, installed, and/or purchased by the associated account and/or device. Google operates an online marketplace whereby Google and other third-party vendors offer for sale applications such as games, productivity tools, and social media portals. Many of these applications can be used to communicate outside the cellular service of a mobile device by accessing the internet via Wi-Fi. These various applications facilitate communication via voice using voice over internet protocol (VOIP) technology, short message system (SMS) text messages, multi-media message system (MMS) text messages, audio transmission of recorded messages, and recorded or live video messages. As these services operate independently of the cellular service network there is no corresponding information regarding communications from the cellular provider. Identifying communications applications purchased, downloaded, and/or installed on the mobile device would assist investigators by determining what application provider should be served with additional search warrants. Furthermore, identifying the user's applications would assist investigators with determining banking and other financial institution information and social media sites used. Identifying the purchased or installed applications would assist locating those with potentially criminal implications such as applications that appear to the observer to be a calculator or other innocuous appearing program but in actuality are used to conceal pictures, videos, and other files. These concealment applications are commonly missed during manual and forensic examinations of mobile devices as existing technologies are not designed to detect and locate them and the information they conceal.

L. *Search History* - All search history and queries, including by way of example and not limitation, World Wide Web (web), images, news, shopping, ads, videos, maps, travel, and finance. Google retains a user's search history whether it is done from a mobile device or from a traditional computer. This history includes the searched for terms, the date and time of the search, and the user-selected results. Furthermore, the specific type of search a user performed into categories differentiates these searches. These categories include a general web search and specialty searches where the results are focused in a particular group such as images, news, videos, and shopping. I believe a review of the TARGET ACCOUNTS' search history will reveal information relevant to the TARGET OFFENSES by revealing what information the individual or individuals who own and/or operate the TARGET ACCOUNTS sought and when he/she sought it.

39

M. *Voice* - All call detail records, connection records, short message system (SMS) or multimedia message system (MMS) messages, and voice-mail messages sent by or from the Google Voice account associated with the target account/device. Google offers users access to a free voice over internet protocol (VOIP) communications system called Google Voice or simply Voice. This system is layered on top of any existing cellular service. Users are provided with a phone number they select from a pool of available numbers. These numbers can be from whatever area code and prefix they desire and have no correlation with the user's actual location when the number is selected. Google allows users to access this system to make and receive phone calls and text messages. The service also has a voice-mail feature where incoming phone calls are permitted to leave a message that is subsequently transcribed by Google and delivered by electronic mail and/or text message. Google maintains call detail records similar to those of a traditional cellular or wireline telephone company. Additionally, they also store the text message content of sent and received text messages, as well as, any saved voice-mail messages and the associated transcriptions.

N. *Android Auto* - All information related to Android Auto including device names, serial numbers and identification numbers, device names, maps and map data, communications including call logs and text messages, voice actions, and all location data. Android Auto is a mobile device application developed by Google that allows enhanced use of an Android device within a vehicle equipped with a compatible head unit. Once the Android device is connected to the head unit, the system enables it to broadcast applications (apps) with a simple, driver-friendly user interface onto the vehicle's dash display, including GPS mapping/navigation, music playback, text messages (SMS), voice calls, and web search. The system supports both touchscreen and button-controlled head unit displays, although hands-free operation through voice commands is encouraged. Once the user's Android device is connected to the vehicle, the Android mobile device will have access to several of the vehicle's sensors and inputs, such as GPS, steering-wheel mounted buttons, the sound system, directional microphones, wheel speed, compass, and other vehicle data. I believe the Android Auto related data, including the historical geo-location data (GPS, compass, speed, direction) may be important in establishing locations and activities of possible witnesses, victims, co-conspirators, and suspects. This information may also be important to refute and corroborate statements and can be used to establish a timeline and provide context and intent.

O. *Tombstone Archive* - All data associated with the TARGET ACCOUNTS related to the "Tombstone" data archive. Google subscribers have the ability to delete their Google account information and any associated data at any time. Google will store this data if the subscriber deleted their user profile and all associated data related to their Google account, to include all the above-mentioned technologies, in what Google refers to as the "Tombstone" data archive. I learned Google will retain this data after a subscriber-initiated deletion of the account data, however it is not known how long Google will retain it. I believe this "Tombstone" data archive may be pertinent to the case, as data that may have been deleted was done with deliberate intention, with the intent of concealing or destroying evidence. The data, if deleted by the user and recovered via

40

the "Tombstone" archive, may hold the valuable information related to the ongoing criminal investigation. Due to the transient nature of the "Tombstone" data archive, the fact it is perishable data and not recoverable by law enforcement after a given period of time from subscriber-initiated deletion, it becomes imperative this data is obtained in a timely manner. In accordance with U. S. Code, Title 18, § 2703(f), and § 2703(h)(5)(B), and in compliance with the obligations of the Stored Communications Act (SCA), preservation of the "Tombstone" data archive was initiated on or about November 26, 2025, and renewed on or about March 4, 2026, prior to the preparation of this search warrant.

139.    Based on my training and experience, I respectfully submit that there is probable cause to believe that each of the above-listed categories of information will contain evidence of the TARGET OFFENSES because they tend to show the true identity of the individual or individuals who owned and/or operated the TARGET ACCOUNTS.

## CONCLUSION

140.    Based on the foregoing, I respectfully submit that there is probable cause to believe that the TARGET ACCOUNTS, as further described in Attachment A, contain evidence, contraband, fruits, and instrumentalities of the TARGET OFFENSES, as further described in Attachment B.

141.    I therefore respectfully request that the Court issue a warrant authorizing a search of the TARGET ACCOUNTS.

41

142.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Google  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Frank McQuillan
Special Agent
Department of Veterans Affairs, Office of Inspector General

Affidavit submitted electronically by email in .pdf format. Oath administered and contents and signature attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this _19th_ day of May, 2026.

_____
HON. COLLEEN D. HOLLAND
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information associated with the Google accounts associated with the following email addresses stored at premises controlled by Google, a company that accepts legal service at 1600 Amphitheatre Parkway, Mountain View, CA 94043:

    a.      JAMIE@DSDT.TECH ("TARGET ACCOUNT 1");

    b.      KATIE@DSDT.TECH ("TARGET ACCOUNT 2");

    c.      MACKENZIE@DSDT.TECH ("TARGET ACCOUNT 3");

    d.      ASHLEY@DSDT.TECH ("TARGET ACCOUNT 4"); and

    e.      THANDEKA@DSDT.TECH ("TARGET ACCOUNT 5")

(hereinafter, collectively the "TARGET ACCOUNTS").

**ATTACHMENT B**

**Particular Information to be Seized**

### I.      Information to be disclosed by Google (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a requests made under 18 U.S.C. § 2703(f) on or about November 26, 2025, and on or about March 4, 2026, the Provider is required to disclose the following information to the government for each of the TARGET ACCOUNTS:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

1

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account, including but not limited to address books, contact and buddy lists, calendar data, pictures, and files, Account Information, Android Information, Evidence of User Attribution, Calendar, Contacts, Documents, Google Pay, Gmail, Google Photos, Location History, Play Store, Search History, Voice, Android Auto, and Tombstone Archive; and

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

II.    **Information to be seized by the government**

All records and information described above in Section I that constitutes contraband, evidence, fruits, or instrumentalities of violations Title 18, United States Code, Section 287 (False, Fictitious, or Fraudulent Claims), Title 18, United States Code, Section 371 (Conspiracy), Title 18, United States Code, Section 641 (Theft of Government Funds), Title 18, United States Code, Section 666 (Theft or Bribery Concerning Programs Receiving Federal Funds), Title 18, United States Code, Section 1001 (False Statements), Title 18 United States Code, Section 1028A (Aggravated Identity Theft), and Title 18, United States Code, Sections 1343 and 1349 (Wire Fraud and Conspiracy to Commit Wire Fraud) (hereinafter, collectively the "TARGET OFFENSES"), from January 1, 2019, to the present, including, for each of the TARGET ACCOUNTS, records and information pertaining to the following matters:

(a) Records and information, including the contents of communications, relating to person(s) who created, used, or communicated using the TARGET ACCOUNTS, including records about their identities and whereabouts;

(b) Communications with United States military veterans who were seeking enrollment, were presently enrolled in, or have completed enrollment in an education benefits program administered by the Department of Veterans Affairs ("VA");

(c) Records and information, including the contents of communications, regarding the employment of United States military veterans who were enrolled in any education benefits program administered by the VA;

3

(d) Records and information, including the contents of communications, regarding the VA and/or VA educational assistance payments;

(e) Communications with the VA;

(f) Records and information, including the contents of communications, regarding the receipt and disposition of payments from the VA;

(g) Records and information, including the contents of communications, regarding any assets or accounts accessed or used by DSDT, HARRIS, KOTHE, FULTON, TANCREDI, and/or HLATSHWAYO during the relevant timeframe;

(h) Records and information, including the contents of communications, regarding how and when the TARGET ACCOUNTS were accessed or used;

(i) Records and information, including the contents of communications, regarding the identity of any coconspirators, accomplices, and/or aiders and abettors in the commission of the TARGET OFFENSES.

4